## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DEBRA CARTER, | ) | |
| MICHAEL DORE, | ) | |
| ERIC R. TERRY, | ) | |
| JOHN C. DORE III, | ) | |
| MICHAEL DORE, | ) | |
| LINDA MASHBURN, | ) | |
| ROBERT MASHBURN SR, | ) | |
| ROBERT MASHBURN JR, | ) | |
| FERNANZA L FAVORS, | ) | |
| LAWRENCE SINGER, | ) | |
| MICHAEL TARRINGER, | ) | |
| LAWRENCE SINGER, | ) | |
| VICTORIA KEALY, | ) | CIVIL ACTION FILE # |
| JENNIFER HOLSTROM, | ) | |
| DENNIS DAVIDSON, | ) | |
| JANEY LYNN DAVIDSON, | ) | _____ |
| PATRICIA MARSHALL DAVIDSON, | ) | |
| RUSSELL JAY DAVIDSON, | ) | |
| TIMOTHY MICHAEL DAVIDSON, | ) | |
| MARK MONROE SHELOR, | ) | |
| CHISA B HUTCHINSON, | ) | |
| PAMELA WALDOCH, | ) | |
| BEVERLE ANN WALDOCH, | ) | |
| DANIEL WALDOCH, | ) | |
| KIMBERLY S BRYANT, | ) | |
| ALONZO E BRYANT JR, | ) | |
| KAYLAN A BRYANT, | ) | |
| AMENA MITCHELL, | ) | |
| MARIE E. CHAMBERS, | ) | |
| JOHN C. DORE II, | ) | |
| ALANA E. CONLEY, | ) | |
| MICHELE J HENNESSY, INDIVIDUALLY | ) | |
| AND AS NEXT FRIEND OF LHA, | ) | |
| A MINOR, AND OF THA, A MINOR, AND | ) | |

JOHN DOE AS REPRESENTATIVE OF    )
ESTATE OF BILL THOMPSON (DECEASED),  )
                               )
           Plaintiffs,         )
                               )
v.                               )
                               )
UNITED STATES OF AMERICA,      )
                               )
           Defendant.       )

## CLASS ACTION COMPLAINT

COME NOW, Plaintiffs above-named (hereinafter "Plaintiffs"), Individually, and as class representatives, and file this their Class Action Complaint, showing the Court as follows:

## STATEMENT OF THE CASE

Defendant supplied contaminated water as potable water for decades at its military base Camp Lejeune, North Carolina. Believed to be one of the largest water contamination cases in U.S. history, the Department of Veterans Affairs has estimated that approximately 900,000 people were exposed to the United States' contaminated water at Camp Lejeune. The contaminated water was used by people at Camp Lejeune for all purposes, including drinking, bathing, and cooking. The U.S. says that by sometime after 1985, it stopped supplying contaminated water as potable. The U.S. knew it was supplying contaminated water as potable and it knew the identity of the persons on the base at Camp Lejeune who would have been using

that contaminated water.  The U.S. did not warn the people about the Camp Lejeune, North Carolina contaminated water exposures when they were occurring.

Over the years since 1985, the U.S. obtained a great deal of material new information about the Camp Lejeune toxic exposures, such as the identity and concentrations of the contaminating chemicals, and the risks that the prior exposures might kill them, or cause and or aggravate cancers and other illnesses.  The U.S. again failed to warn about the prior exposures, and this time also failed to warn about the material new information it had obtained about the chemicals and the exposure risks.  As to each Plaintiff, these subsequent torts occurred in their respective state of residence, whether that be Georgia, North Carolina or otherwise.

On and after January 24, 2019, the U.S. denied the administrative tort claims of the named Plaintiffs here, along with all the other Camp Lejeune Federal Tort Claims Act administrative claimants.  See attached, Exhibits A and B.  That mass denial forced the filing of this Complaint, as the administrative claimants only had 6 months after denial to file a lawsuit on their claims or those claims would have been administratively barred.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiffs are persons who have submitted administrative claims pursuant to the Federal Tort Claims Act ("FTCA") 28 U.S.C. §§ 1346, 2671 – 80, *et seq*. and

whose administrative claims have been denied and or have been pending for more than six (6) months.

2.      At all pertinent times, Plaintiffs were and are citizens of the United States of America.

3.      That the acts and omissions complained of herein were performed by agents, servants and/or employees acting within the course and scope of their employment with the Defendant, thereby rendering the Defendant liable in damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 – 80, *et seq*.

4.      Each Plaintiff and putative class member timely filed a claim with the Department of the Navy Judge Advocate General's Office pursuant to the requirements of the Federal Tort Claims Act, and more than six (6) months has elapsed since filing of said claim, thereby establishing jurisdiction in this honorable Court pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2675.

5.      Jurisdiction and venue are proper within this honorable Court pursuant to 28 U.S.C. §§ 1402(b) and other applicable authority.

## STATEMENT OF FACTS

6.      At all times relevant hereto, the Defendant owned, controlled and or operated the military base located at and known as Camp Lejeune, North Carolina (hereinafter "Camp Lejeune).

7.     At all times relevant hereto, the Defendant was responsible for doing whatever was necessary to provide a water supply that was uncontaminated and was otherwise safe for drinking, bathing and for all other purposes for all occupants of Camp Lejeune and any other persons reasonably foreseen to use the aforementioned water supply for personal use, contact and or consumption.

8.     At all times relevant hereto, the Defendant was responsible for properly constructing the water wells, and maintaining, inspecting and otherwise providing that the property which it constructed, owned, controlled and or operated at Camp Lejeune did not have dangerous and or hazardous contaminants or pollutants in the water supply system that could contaminate the people's water supply, regardless of the source of such contaminants or pollutants.

9.     At all times relevant hereto, Defendant was required to properly construct the water wells, and maintain and otherwise provide a water supply system that was in compliance, not only with due care, but also with any and all federal, state and or all applicable military regulations, orders, procedures, instructions or standards to ensure the health, safety and welfare of all individuals that were reasonably foreseeable to consume or become physically exposed to said water supply system.

10.     Defendant was at all times relevant hereto required to comply with and follow at Camp Lejeune, the Department of the Navy, Bureau of Medicine and Surgery ("BUMED") Instruction 6240.3B and Instruction 6240.3C.

11.     The BUMEDs created and mandated a duty on the part of the command staff, agents, servants and employees of the Defendant at Camp Lejeune.

12.     BUMED 6240.3B and C as applicable to various naval bases, including Camp Lejeune, mandated that the water supply had to be adequate in capacity to meet maximum demands without creating health hazards; to be located, designed and constructed to eliminate or prevent contamination or pollution and to be conscientiously operated by well-trained and competent personnel whose qualifications were commensurate with the responsibilities of their positions.

13.     Defendant failed to non-negligently construct the water wells and water supply and distribution system at Camp Lejeune so as to eliminate or prevent contamination or pollution of the water supplied.

14.     The definition of a health hazard as mandated by BUMED 6240.3B and C, means any condition, devices or practices in the water supply system and its operation, including structural defects, whether in the design or construction, which create or may create a danger to the health and well-being of the water consumer,

which included all those persons reasonably expected to be drinking and bathing in the water at Camp Lejeune, including each Plaintiff.

15.     BUMED 6240.3B and C, at all pertinent times mandated, among other things, that a health hazard was to be considered by employees, agents and servants of the Defendant to mean any defects in the location, design or construction of the water supply system, which may regularly or occasionally prevent satisfactory purification of the water supply or cause it to be polluted from extraneous sources, even if the physiological effects of the pollutants or contaminants were not known.

16.     The BUMEDs, mandated and required the command staff, agents, servants and employees of the Defendant at Camp Lejeune to ensure that the water supply be obtained from the most desirable source feasible, that efforts be made to control contaminants or pollution of the source and that if the source were not protected adequately by natural means, that it be adequately protected by treatment.

17.     The BUMEDs, mandated and regulated the command staff at Camp Lejeune to take affirmative steps to make frequent sanitary surveys to locate and identify health hazards which might exist in the water supply system.

18.     The BUMEDs, mandated and regulated a duty to enforce rules and regulations to prevent the development of health hazards in the water supply system, to adequately protect the water quality throughout all parts of the system, as

demonstrated by "frequent surveys," to see that there is proper operation of the water supply under the "responsible" charge of personnel, to ensure adequate capacity to meet peak demands in the water supply without the development of health hazards, and to record the laboratory examinations to demonstrate consistent compliance with the water quality requirements of these standards.

19.    Base Orders effective at all pertinent times herein commanded and directed command personnel, agents, servants and employees of the Defendant to cause periodic inspections to be made of contaminants and hazardous materials in stock and to take steps to avoid improperly practices of disposal that may contaminate, among other things, the drinking water at Camp Lejeune.

20.    At all pertinent times the Defendant, through its agents, servants and employees, acting within the course and scope of their employment, negligently, carelessly and recklessly failed to follow their mandate and failed to exercise due care by causing or allowing various pollutants and contaminants, such as tetrachloroethylene, trichloroethylene, dichloroethylene, vinyl chloride and benzene to exist in the base water supply in quantities that Defendant knew or should have known were dangerous to the life, health and welfare of those to whom they were supplying the water, including Plaintiffs.

21.    Subsequent to Defendant knowing or having reason to know that the water supply was contaminated or polluted with potentially dangerous and or hazardous chemicals, Defendant had for years following the exposure a duty to warn the consumer to whom it was supplying said water, even if physiological effects were uncertain or unknown.

22.    The Camp Lejeune base command was alerted by its own surveillance that the water was so highly contaminated with chemicals that the values of certain chemicals in the water could not be measured as a result.

23.    Defendant was alerted to the presence of heavy organic chemicals and the need to analyze the drinking water for chlorinated organics, such as tetrachloroethylene, trichloroethylene and vinyl chloride, but failed to do so.

24.    Defendant, through its agents, servants and employees, acting within the course and scope of their employment, negligently, carelessly and recklessly failed to follow the mandated responsibilities, as well as those responsibilities required by due care, to conduct an investigation of the report by qualified personnel and to conduct frequent surveys, to enforce regulations, orders, procedures, instructions and/or standards and to take all reasonable steps to make sure that the contaminants even from extraneous sources did not pose a potential danger to the health and well-being of the persons expected to use that water, including Plaintiffs.

25.     Defendant knew that the contaminated water presented a health hazard to the persons expected to use the water supply, but it carelessly, negligently and recklessly failed to take the necessary steps to warn, examine, survey, protect and or take reasonable steps to provide a safe water system to the consumer personnel at Camp Lejeune, including Plaintiffs.

26.     The Base Command was advised that the source of the dangerous contamination and pollution was the well fields owned and operated by the Defendant.

27.     At all times relevant, agents, servants and or employees of the Defendant, acting within the course and scope of their employment, in addition to allowing pollutants and contaminants into the water supply system from other sources, caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped and disposed of within Camp Lejeune property surreptitiously and under the cover of darkness and under the guise of training exercises for firemen, in addition to negligently and recklessly permitting spills and drum disposal, as well as solvent disposal practices from off-base facilities, without providing notice or warnings to consumers that they were being exposed to the dangerous and/or potentially poisonous substances that the Defendant knew or should have known were contaminating the aforementioned water supply system.

28.    At all times relevant, the Defendant knew or should have known that providing water with contaminants, including chlorinated solvents, regardless of the source, would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, central nervous system disturbances in humans, disfigurement, pain, suffering and possibly death to the people to whom Defendant provided said water system.

29.    That in or about November 1979, the Defendant, through the Environmental Protection Agency ("EPA"), published a Suggested No Adverse Reaction level for trichloroethylene of no more than 75 parts per billion in a water supply.

30.    In or about April 1980, the Defendant, through the EPA, published a Suggested No Adverse Reaction Level for perchloroethylene (another name for Tetrachloroethylene) for long term exposure not to exceed 20 parts per billion in a water supply system.

31.    The EPA's Suggested No Adverse Reaction Levels for perchloroethylene and trichloroethylene, regardless of whether they were "legally" binding, along with other publications and mandates, procedures or standards, such as the said BUMEDs, actively or constructively, put the base command on further notice that the exceedingly high levels of contaminants and pollution in the water supply system

would likely and foreseeably cause harm to the people to whom they were supplying the subject water.

32.    In fact, when the tap water was tested in or about May of 1982, the trichloroethylene level in the Hadnot Point area of Camp Lejeune was as high as 140 parts per billion and in July 1982 in Tarawa Terrace, a residential area of Camp Lejeune there were 104 parts per billion of tetrachloroethylene in the water supply.

33.    When testing was performed in or about February of 1985, the trichloroethylene in the water supply system was as high as 1148 parts per billion and the dichloroethylene level as high as 406 parts per billion and the dichloroethylene level as high as 406 parts per billion in the Berkley Manor Elementary School area of Camp Lejeune and the tetrachloroethylene was 215 parts per billion, with one well supplying the water to consumers at Camp Lejeune having 18,900 parts per billion of trichloroethylene, 400 parts per billion of perchloroethylene, 8,070 parts per billion of dichloroethylene and 655 parts per billion of vinyl chloride.

34.    At no time did the Defendant warn the individuals at the base or those coming onto the base or those that had previously been on the base that would be reasonably expected to use or have used that water, that said water supply could and or would potentially harm them and their families.

35.    Defendant sent a Notice to Residents of Tarawa Terrace, an area of Camp Lejeune, that there was a problem "supplying enough water" because two wells were taken off-line because "minute (trace) amounts of several organic chemicals have been detected in the water."

36.    The notice was in itself an act of negligence, carelessness and recklessness on the part of the base command staff in that it affirmatively ignored a duty to warn the users of the subject water of exceedingly high levels of pollutants or contaminants while engendering detrimental reliance on the part of the consumers of the water by stating that the pollutants and contaminants existed only in "minute" or "trace" amounts when the command staff knew or should have known that the levels and nature of the pollutants and contaminants were so exceedingly high they could cause, among other illnesses, kidney and live damage, damage to the central nervous system, disfigurement in fetuses, cancer and other potential health problems and/or death.

37.    The federal Agency for Toxic Substances and Disease Registry, a statutorily created agency, an operating division with the United States Department of Health and Human Services, at the direction and/or request of the Defendant's Department of Defense, revealed to the public that for a thirty year period, extending at least from 1957 through 1987, the level of chlorinated solvents in the water supply at

Camp Lejeune exceeded Navy regulations, procedures or standards, instructions and was at times hundreds and sometimes thousands of times greater than levels known by the Defendant to be the acceptable and safe levels for use by human beings.

38.    Camp Lejeune was declared to be a federal Superfund site in 1989 because of the hazardous, wide-spread high-level contamination of the base.  One of the EPA directed treatments for Camp Lejeune resulted in approximately 43,000 pounds of trichloroethylene being removed from the source area.

39.    The drinking water available in the housing complex and elsewhere on the base was found to be contaminated with several chlorinated hydrocarbon solvents and other materials.

40.    All of the chlorinated hydrocarbon contaminants in the water supply at Camp Lejeune have been identified as human carcinogens.  All but dichloroethylene have been shown to be liver and/or kidney carcinogens.  The significantly high levels of contaminant in the water supply at Camp Lejeune represent exposure significant enough to cause cancer.  In general, there is a latency of some 20 to 25 years between initial exposure and the development of cancer due to exposure.

41.    Solely for purposes relating to the timeliness of the filing of each Plaintiff's claim, the United States hid Plaintiff's exposure to pollutants and/or contaminants in the water supply at Camp Lejeune from Plaintiffs and hid its conduct in causing

said exposure.  Consequently, the cause of Plaintiff's injuries and Defendant's responsibility and liability therefore were unknown and not reasonably knowable to Plaintiffs until less than two years prior the filing of this Complaint

42.    Defendant defectively planned, designed and constructed the water wells at Camp Lejeune.

## NEGLIGENCE

43.    At all times relevant hereto, Defendant owed Plaintiffs a duty of care to properly design and construct the water wells and water distribution system at Camp Lejeune;  to not provide contaminated water as potable water Camp Lejeune; to not cause damage or injury to Plaintiffs; and to warn Plaintiffs about the contaminated water exposures, the toxic chemicals and concentrations, and the associated human exposure risks.

44.    Defendant breached all of its duties of care owed to Plaintiffs.

45.    Defendant's conduct is the actual and proximate cause of each Plaintiff's wrongful death, pain and suffering, loss of consortium, and or other damage and injury.

46.    Defendant is liable to Plaintiffs in dollar amounts to be determined by the trier of fact, for each Plaintiff's wrongful death, pain and suffering, loss of consortium, and or other damage and injury.

47.   It was foreseeable to Defendant that Plaintiffs would be injured by Defendant's conduct set out above and

> [a]   because the reference in the FTCA § 1346(b)(1) to the law of the place where the act or omission occurred means the law of the state where the tort occurred, no North Carolina toxic exposure statute of repose bars a negligent failure to warn or wrongful death, or other tort claim, where the tort occurred outside of North Carolina; and

> [b]   because the US owned and was involved in the negligent and defective design, negligent and defective planning, and negligent and defective construction of the water wells and water supply and distribution system at Camp Lejeune, the Section 1-50(a)(5) six-year statute of repose is the only North Carolina statute of repose that might be applicable to certain FTCA claims pursuant to NC law, though that statute is no bar to the claims set out in this Complaint; and

> [c]   pursuant to authority of Cole v. U.S., 755 F2d 873 (11th Cir.1985), neither the *Feres* doctrine nor the *Discretionary Function* exception, bar Plaintiffs claims in this case.

## CLASS ACTION ALLEGATIONS

48.   Plaintiffs bring this Class action on behalf of the proposed Classes as set forth below:

*-Already Denied Administrative Claim Class-*

All natural persons, including any person claiming by, through or under a Class Member, who, as of the time of filing the original complaint, were at Camp Lejeune, North Carolina prior to the filing of this Complaint and who used the contaminated water, and who have already submitted an administrative claim to the US for damage and injury as a result of that exposure to the contaminated water.

*-Subsequently Submitted Administrative Claim Class-*

All natural persons, including any person claiming by, through or under a Class Member, who, as of the time of filing the original complaint, were at Camp Lejeune, North Carolina prior to the filing of this Complaint and who used the contaminated water, and who after this Complaint was filed, submits an administrative claim to the US for damage and injury as a result of that exposure to the contaminated water, and whose administrative claim is subsequently denied and or no paid or denied six months after submission.

*-Excluded from the Classes are-*

a.  The US and its legal representatives;

b.  The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

c.  Any attorneys, or their immediate families, representing Plaintiffs or Members of the proposed Classes;

d.  All persons who otherwise would be included under one or more of the class descriptions but who have filed a lawsuit for manifest personal injury for illness related to exposure to the contaminated water;

e.  All persons who properly execute and timely file a request for exclusion from the Classes, if the opportunity is provided to opt out of the Classes.

49.    Plaintiffs reserve the right to modify and/or amend the definition of the Classes, if, prior to the Court's determination on whether certification is appropriate, discovery and further investigation reveals that either Class should be modified or amended in any way.

## Fed. R. Civ. P. 23(a) and 23(b)(3)

50.    Plaintiffs bring this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a Class action on their own behalf and on behalf of other persons similarly situated.    This action satisfies the

numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

## Numerosity

51.     Although the exact number of Class Members is uncertain at this time and can be ascertained only through appropriate discovery, the Members of the Classes are so numerous that separate joinder of each member is impracticable.    Upon information and belief, the number of Class Members in each class is likely to be well over 4000. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

52.     Putative Class Members are readily identifiable through publicly available property records.

## Typicality

53.     Plaintiffs' claims are typical of the claims to be advanced by Members of the Classes, and their claims encompass those of the other Class Members in each class, in that the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Plaintiffs are the same kinds of damages suffered by the Members of the Classes.

**Adequate Representation**

54.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, as their interests do not conflict, their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories, they are similarly damaged and are seeking the same remedies, and they intend to prosecute this action vigorously.

55.    Plaintiffs have retained counsel competent and experienced in complex Class action and toxic tort litigation, including actions like this one, representing putative Class Members whose properties have been contaminated and/or devalued by the acts and omissions of a polluter.  Plaintiffs' counsel intend to prosecute this action vigorously.

**Predominance of Common Questions**

56.    With respect to issues and claims raised herein, questions of law and fact common to Class Members predominate over any questions affecting only individual members of the Classes.   The only individual question affecting individual Members of the Classes is the precise amount of damages to which each Class Member is entitled, and such damages may be reasonably and fully determined and calculated through the mechanism of a class action.  On the other hand, there are questions of law or fact common to the Classes, including, but not limited to:

a. The history of Defendants' dumping of chemicals on the Camp Lejeune military base;

b. Whether Defendants owed a duty to Plaintiffs and Members of the Classes to prevent and/or minimize any discharge or release of chemicals into the surrounding environment;

c. Whether Defendants knew or reasonably should have known that the failure to have policies or procedures regarding the proper handling, cleanup, or disposal of chemicals would result in contamination to water and cause damages to Plaintiffs and Members of the Classes;

d. Whether it was reasonably foreseeable to Defendants that the discharge or release of chemicals into the environment would result in contamination of water and cause damages to Plaintiffs and Members of the Classes;

e. Whether the Defendants owed a duty to warn the Plaintiffs and Members of the Classes that the water contained elevated levels of chemical contamination and that they were likely to be exposed.

**Superiority**

57.    A Class action is superior to other available methods for the fair and efficient adjudication of this controversy.

58.    Absent a Class action, most Class Members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would not have an effective remedy at law.   Further, there is no interest by Class Members in individually controlling the prosecution of separate actions.

59.    Class treatment of common questions of law and fact will conserve the resources of the courts and litigants and will promote consistency and efficiency of adjudication.   Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

**Fed. R. Civ. P. 23(a) and 23(b)(2) Injunctive or Declaratory Relief**

60.    In addition to the above, Plaintiffs bring this Class action under Fed. R. Civ. P. 23(a) and 23(b)(2), because Defendant has acted or refused to act on grounds that apply generally to the Classes, such that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.   Such injunctive relief includes, but is not limited to an Order or injunction requiring Defendant to fund a medical monitoring program sufficient to monitor the deleterious effects and potentially-deleterious effects of toxic chemicals on the human body and to detect these effects to the extent possible.

**Fed. R. Civ. P. 23(a) and 23(c)(4) Certification of Particular Issues**

61.     In the alternative to certification under Fed. R. Civ. P. 23(b)(2) or 23(b)(3), Plaintiffs and Members of the Classes seek to maintain a Class action with respect to particular issues under Fed. R. Civ. P. 23(a) and 23(c)(4).

62.     The liability of Defendant for the damages caused to Plaintiffs and Class Members, including liability for negligence, statutory strict liability, private nuisance, failure to warn, and the claim for medical monitoring, is suitable for issue certification under Fed. R. Civ. P. 23(c)(4).

WHEREFORE, Plaintiffs and Members of the above proposed Classes respectfully request this Court to grant the following relief:

[A]     That this case be certified as a Class action as proposed, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

[B]     Grant Plaintiffs a trial upon their claims;

[C]     Enter Judgment in favor of Plaintiffs and against Defendant;

[D]     Order Defendant to pay damages to Plaintiffs in amounts determined by the trier of fact; and

[E]     Grant Plaintiffs such other relief as this Court deems just and proper.

Respectfully submitted this 19th day of June, 2019.

/s/ Donald D.J. Stack
_____
Donald D.J. Stack - Ga. Bar # 673735
STACK & ASSOCIATES, P.C.
260 Peachtree Street, N.W.
Suite 1200
Atlanta, Georgia  30303
Telephone:  (404) 525-9205
Facsimile:  (404) 522-0275
dstack@stackenv.com


 /s/ Robert Jackson
_____
Robert Jackson - Ga. Bar # 387750
ROBERT B. JACKSON, IV, LLC
260 Peachtree Street, N.W.
Suite 2200
Atlanta, Georgia   30303
Telephone:  (404) 313-2039
rbj4law@gmail.com

## CERTIFICATION UNDER L.R. 7.1D

Pursuant to Northern District of Georgia Local Rule 7.1D, the undersigned counsel for Plaintiff hereby certifies that the above and foregoing pleading is a computer document prepared in Times New Roman (14 point) font in accordance with Local Rule 5.1B.

So certified this 19th day of June, 2019.

*/s/ Donald D.J. Stack*

_____
Donald D.J. Stack - Ga. Bar # 673735
STACK & ASSOCIATES, P.C.
260 Peachtree Street, N.W.
Suite 1200
Atlanta, Georgia  30303
Telephone:  (404) 525-9205
Facsimile:  (404) 522-0275
dstack@stackenv.com